# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BROTHER CONVENIENCE STORE, INC., *et al.*,

      Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF AGRICULTURE,

      Defendant.

Case No. 1:20-cv-01346-GLR

---

## MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS OR, IN THE ALTERNATIVE,
## FOR SUMMARY JUDGMENT

---

Robert K. Hur, United States Attorney
Alan C. Lazerow
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201

*Counsel for Defendant*

OF COUNSEL:
Virginia Henning
Attorney Advisor
United States Department of Agriculture
Office of the General Counsel
Harrisburg, Pennsylvania 17108

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ....................................................................................................... 1

II.    OVERVIEW OF THE SNAP BENEFIT PROGRAM .......................................... 2

    A.    GENERAL BACKGROUND ............................................................................. 2

    B.    FNS'S ROLE IN COMBATING FRAUD GENERALLY; ADMINISTRATIVE PENALTIES AND REVIEW PROCESS ............................... 4

    C.    PENALTIES FOR TRAFFICKING IN SNAP BENEFITS ................................. 5

III.    STATEMENT OF FACTS ................................................................................... 6

    A.    THE STORE IS ACCEPTED INTO SNAP ..................................................... 6

    B.    BASED ON AN UNDERCOVER INVESTIGATION, FNS CHARGES THE STORE WITH TRAFFICKING IN SNAP BENEFITS .................................. 7

    C.    THE STORE CHALLENGES THE CHARGE LETTER AND FNS DETERMINES THAT THE STORE SHOULD BE DISQUALIFIED FROM SNAP ............................................................................................... 10

    D.    THE STORE SEEKS FURTHER ADMINISTRATIVE REVIEW AND ITS PERMANENT DISQUALIFICATION IS UPHELD .......................................... 12

IV.    APPLICABLE LEGAL STANDARDS .............................................................. 16

    A.    SCOPE OF JUDICIAL REVIEW ................................................................. 16

    B.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ......................... 18

    C.    MOTION FOR SUMMARY JUDGMENT ....................................................... 19

V.    ARGUMENT ...................................................................................................... 20

    A.    THE COURT SHOULD DISMISS THE COMPLAINT, UNDER RULE 12(b)(6), FOR FAILURE TO STATE A CLAIM ............................................. 20

    B.    ALTERNATIVELY, THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR THE DEFENDANT BECAUSE THE RECORD CLEARLY DEMONSTRATES TRAFFICKING OF SNAP BENEFITS AND

BECAUSE THE PENALTY OF DISQUALIFICATION WAS NOT ARBITRARY AND CAPRICIOUS ...................................................................................23

    i.    *Count I: The Agency's Determination that the Store Engaged in Trafficking Is Fully Supported by the Administrative Record*................................23

        a.    Rapid and Repetitive Transactions in a Short Period, from the Same Household, Evidence Trafficking………………………...................24

        b.    High-Dollar Transactions also Evidence Trafficking ……………………………………………………………………...26

    ii.    *Count II: The Agency's Decision to Disqualify the Store Permanently Is Mandated by Statute and Is thus Not Arbitrary and Capricious*……………………………………………………………28

    iii.    *Count III: The Store's Permanent Disqualification Does Not Violate Plaintiffs' Substantive Due Process Rights, and the Judicial Review Provisions Comport with Procedural Due Process*……………………………………………………...29

VI.    CONCLUSION……………………………………………………………...30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BROTHER CONVENIENCE STORE, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-01346-GLR |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR,**
**IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

The United States Department of Agriculture (the "Defendant" or the "Agency"), by its counsel, Robert K. Hur, United States Attorney for the District of Maryland, and Alan C. Lazerow, Assistant United States Attorney for that district, submits this *Memorandum in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment*.

## I.   INTRODUCTION

Plaintiffs Hesham A. Ghaleb and Maged A. Ghaleb, owners of Brother Convenience Store, Inc. (the "Store," and together with the Ghalebs, the "Plaintiffs"), a small convenience store located at 3358 Greenmount Avenue, Baltimore, Maryland 21218, sue under the Food and Nutrition Act of 2008, 7 U.S.C. §§ 2011 *et seq.* (the "Food and Nutrition Act"), formerly known as the food stamp program, and now known as the Supplemental Nutrition Assistance Program ("SNAP"). Following a six-month investigation, the USDA's Food and Nutrition Service ("FNS") uncovered two suspicious transaction patterns indicative of the illegal trafficking of SNAP benefits. FNS charged the Store with trafficking, in violation of the Food and Nutrition Act, and following a detailed administrative determination and review process, permanently

disqualified the Store from participating in SNAP.  In its *Complaint and Request for Judicial Review*, *see* ECF No. 1 (the "<u>Complaint</u>"), Plaintiffs request, among other things, that the Court find that they did not engage in trafficking, reverse the Agency's decision, find that the decision to disqualify the Store permanently from SNAP violated Plaintiffs' due process rights, and reinstate the Store into SNAP.

As shown below, Plaintiffs deserve no relief by the Complaint.  The evidence compiled in the Administrative Appeal Record leaves no doubt that the violations occurred, and the sanction is reviewed by the Court under an "arbitrary and capricious" standard.  The statutory and regulatory provisions at issue *mandate* that FNS permanently disqualify stores that have engaged in trafficking, unless they meet specific criteria that would justify an alternative civil monetary penalty (which criteria were not met).  The Agency's findings on the sanction are correctly and fully documented in the Administrative Appeal Record.  And separately, the Store's permanently disqualification from SNAP does not violate Plaintiffs' substantive due process rights, and the judicial review scheme for SNAP disqualifications comports with procedural due process.  As a result, the Court should dismiss the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "<u>Rules</u>") or, in the alternative, grant summary judgment in Defendant's favor on all claims under Rule 56(a).

## II.    <u>OVERVIEW OF THE SNAP BENEFIT PROGRAM</u>

### A.    <span style="font-variant: small-caps;">General Background</span>

SNAP is operated by USDA.  *See* 7 U.S.C. §§ 2011-2036.  The mission of the program is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households."  7 U.S.C. § 2011.  To advance this mission, SNAP aims to increase the food purchasing power of eligible households by

supplementing the funds families have to spend on food with food stamp allotments, which may be used for purchasing food items at authorized retail food stores. *See id.* § 2013. SNAP benefits can be redeemed only for purchases of food; non-food purchases are not eligible for SNAP benefits. *See id.*; *see also* 7 C.F.R. § 271.2.

The program is administered by FNS. *See* 7 C.F.R. § 271.3. Through FNS, a household's SNAP benefits are now delivered through electronic benefit transfer ("EBT") cards, rather than the paper coupons formerly used. *See* 7 U.S.C. § 2016(j). EBT cards operate similarly to a debit card issued by a bank. At the beginning of each month, a SNAP beneficiary's EBT card is credited with a dollar amount of SNAP benefits for that month. The EBT card is then used at authorized retail food stores to purchase eligible food items. *Id.* § 2013(a).

Retail food stores have one or more EBT terminals in their stores and, as a purchase is made, the retailer swipes the EBT card through the EBT terminal, the recipient enters a personal identification number code on a keypad, and the amount of the purchase is deducted from the beneficiary's EBT card balance. The EBT terminal generates a receipt for each transaction and the balance remaining in the recipient's account for the month is displayed on the receipt. The amount of the recipient's purchase is then electronically credited within two banking days to the retail food store owner's bank account. *See id.* (providing that only retailers approved by USDA may engage in SNAP benefit transactions); 7 C.F.R. § 278.1 (describing process by which retailer becomes an approved SNAP participant). FNS is able to monitor electronically retail food stores' EBT transactions. *See* 7 C.F.R. § 278.6.

Under the relevant SNAP regulations, retail food store owners may not accept EBT benefits as payment for ineligible items – generally non-food items, alcoholic beverages, and some prepared hot food items. *Id.* § 271.2 (defining the "[e]ligible foods" subject to SNAP benefits).

Food store owners are also prohibited from exchanging EBT benefits for cash (one form of trafficking), even if the store discounts the benefits (for example, charging a customer $25 on his or her EBT card in exchange for $20 cash).  *Id.*

### B.   FNS'S ROLE IN COMBATING FRAUD GENERALLY; ADMINISTRATIVE PENALTIES AND REVIEW PROCESS

From the inception of the food stamp program and continuing through its evolution to SNAP, Congress has repeatedly emphasized the importance of combating fraud.  FNS has thus been authorized to monitor participating stores, conduct periodic reviews of stores' EBT transactions, and investigate a store when it believes an investigation is warranted by suspicious data.  *Id.* § 278.6.

FNS also may disqualify or assess a civil monetary penalty ("CMP") against any authorized retail food store from future participation in SNAP if the store violates any provision of the Food and Nutrition Act or a regulation promulgated thereunder.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6.  Such a disqualification must be based on "a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC)."  7 C.F.R. § 278.6(a).  The period of disqualification may range from as little as six months (for a first-time offense of exchanging ineligible non-food items for EBT benefits) to permanent, depending on the nature of the violation.  FNS, in certain circumstances, has the discretion to impose a CMP in lieu of disqualification.  7 C.F.R. § 278.6(a)(1), (e)(1), (f), and (i).

When an investigation results in Agency action to disqualify a store or assess a CMP on the owner, Title 7, C.F.R., Parts 278 and 279, provide for a system of administrative and judicial review.  After receiving written notice of the action, an aggrieved retailer may request review of

the administrative action by FNS.  7 U.S.C. § 2023(a); 7 C.F.R. § 279.1; *see also* 7 C.F.R. § 279.5(c) (defining scope of review for disqualification actions).   If a store requests review, the administrative action is held in abeyance pending disposition of the request for review, unless the penalty is a permanent disqualification for trafficking.  7 C.F.R. §§ 279.1; 279.4(a).  In cases of a permanent disqualification for trafficking, the disqualification action is effective from the date the firm receives notice of the disqualification.  7 U.S.C. § 2023(a)(18).  Upon completion of the review, FNS renders a "Final Agency Decision" and notifies the retailer. 7 C.F.R. § 279.5(e).  This Final Agency Decision becomes effective thirty days from the date of delivery. *Id.* § 279.5(f).  As discussed *infra* Part IV.A., judicial review is also provided by statute.

### C.   PENALTIES FOR TRAFFICKING IN SNAP BENEFITS

Trafficking is defined in 7 C.F.R. § 271.2, and generally involves the exchanging of SNAP benefits for cash or other consideration other than eligible food items.  Even for a first violation, the penalty for trafficking is permanent disqualification.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).  FNS may impose a CMP in lieu of permanent disqualification if the store submits substantial evidence that it had established and implemented an effective compliance policy and program to prevent SNAP violations.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i).  The regulations establish four criteria[1] which the store must satisfy through "substantial evidence" for FNS to have the discretion to impose a CMP in lieu of permanent disqualification:

> *Criterion 1.*  The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> *Criterion 2.*  The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of the violations cited in the charge letter sent to the firm; and

---

[1]   The regulations elaborate on how FNS should evaluate the evidence submitted with a request for a CMP.  *See* 7 C.F.R. § 278.6(i)(1).

*Criterion 3.* The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

*Criterion 4.* Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it was only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm. Upon the second occasion of trafficking involvement by any member of firm management uncovered during a subsequent investigation, a firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. Notwithstanding the above provision, if trafficking violations consisted of the sale of firearms, ammunition, explosives or controlled substances, as defined in 21 U.S.C. § 802, and such trafficking was conducted by the ownership or management of the firm, the firm shall not be eligible for civil money penalty in lieu of permanent disqualification. For purposes of this section, a person is considered to be part of firm management if that individual has substantial supervisory responsibilities with regard to directing the activities and work assignments of store employees. Such supervisory responsibilities shall include the authority to hire employees for the store or to terminate the employment of individuals working for the store.

7 C.F.R. § 278.6(i).

## III.   STATEMENT OF FACTS

### A.   THE STORE IS ACCEPTED INTO SNAP

The Store is a convenience store located at 3358 Greenmount Avenue, Baltimore, Maryland 21218. (A.R. 1).[2] When the Store applied for SNAP authorization, it self-reported that it was organized as a partnership that the Ghalebs owned. (A.R. 6). According to the Complaint, however, the Store is organized as a corporation with the Ghalebs as the officers of the

---

[2]      "A.R." notations refer to the numbered pages of the redacted Administrative Appeal Record that was previously filed at ECF No. 11. The Declaration of Shanta Swezy, Chief of the Administrative Review Branch of the Retailer Policy and Management Division of FNS, certifies that the Administrative Appeal Record (A.R. 1 to 415) is a true and correct copy (as redacted to comply with the E-Government Act) of the record considered by the Agency in sustaining the decision to disqualify the Store permanently from SNAP. ECF No. 11-1. A redacted version of the Administrative Appeal Record is being filed with the Court; an unredacted version is being sent to Chambers and Plaintiff.

corporation.  Complaint ¶¶ 1, 2.  The Store became an authorized SNAP retailer on November 8, 2013.  (A.R. 273).

### B.    BASED ON AN UNDERCOVER INVESTIGATION, FNS CHARGES THE STORE WITH TRAFFICKING IN SNAP BENEFITS

The FNS Retailer Operations Division ("ROD") began an investigation into the Store because the FNS EBT ALERT System[3] revealed that the Store's EBT data, from April through September 2019, contained patterns consistent with trafficking.  (A.R. 272).  On September 3, 2019, an FNS contractor conducted a store visit (the "Store Visit"), to which Hesham consented.  (A.R. 188-192).  Hesham assisted in preparing the report memorializing the Store Visit (the "Store Visit Report").  (A.R. 189, 194).

The Store Visit Report detailed that the Store had no optical scanners at the checkout, no shopping carts, no evidence of a wholesale business, and used the typical pricing structure of prices ending in $.x9.  (A.R. 188).  The Store had one shopping basket and the checkout area operated behind a night window/plastic barrier.  (A.R. 188).  The Store had one checkout area with one cash register and one SNAP EBT terminal.  (A.R. 189).  There was food stored outside the public view, which storage space measured about 392 square feet and contained other staple and nonstaple foods and nonfood items.  (A.R. 189, 191).  The Store had no storage coolers or freezers or food stored at other locations, did not primarily sell one type of food, and did not take orders or provide delivery.  (A.R. 189).  The Store did not round transaction totals up or down at checkout or sell meat bundles, seafood specials, or fruit/vegetable boxes.  (A.R. 189).  The contractor noted the four most expensive items as (i) Nestle Coffeemate Creamer ($19.99); (ii)

---

[3]    ALERT stands for the Anti-Fraud Locator Using Electronic Benefit Transfer (EBT) Retailer Transactions, and is the system that FNS used to analyze daily EBT data for patterns which may reveal fraudulent activity.

Murry's Chicken Wings ($19.99); (iii) Similac Advance Infant Formula ($17.94); and (iv) Similac Sensitive Infant Formula ($17.49). (A.R. 189). Finally, the contractor noted that the Store did not have a kitchen area for food preparation, sell hot food and food for onsite consumption, have a deli/prepared food section (prepared/made-to-order sandwiches), or use store stock to make prepared items. (A.R. 191). The contractor provided a breakdown of the types and quantities of foods available in the four staple food categories (dairy products; fruit and vegetables; breads and cereals; and meats, poultry, and fish), a rendering of the layout, and photographs of the Store. (A.R. 192-242).

ROD reviewed and analyzed all the information in the Store Visit Report and the information about the Store in the FNS system. (A.R. 271-94). ROD noted the Store was a poorly stocked convenience store of about 616 square feet with inventory consisting of canned goods, bread, cereal, dairy products, some frozen items, baby formula, soda, snacks, and candy. (A.R. 278). ROD noted that the Store did not carry fresh meat, meat plans, fresh produce, deli products, or specialty or ethnic foods. (A.R. 278). It also noted that large transactions would be difficult, given that there was one shopping basket, no shopping carts, no optical scanner or conveyor belt, and the about one-square foot check-out counter surrounded by plexiglass. (A.R. 278). ROD also noted that the Store did not accept WIC. (A.R. 278).

ROD also analyzed the Store's SNAP EBT data and found suspicious transaction patterns that fell into two categories: (i) repetitive transaction in a set period by the same household/account ("Scan B2"); and (ii) high-dollar transactions ("Scan F"). (A.R. 280-82). ROD noted that multiple transactions in a set period are methods which stores use to avoid single high-dollar transactions that cannot be supported and concluded that there was little reason for a household to spend large amounts of money at the Store given the Store's limited inventory. (A.R.

280).  ROD noted that the Scan F transactions were considered large based on the observed store characteristics and recorded food stock.  (A.R. 281-82).

ROD identified Comp Store #1 and Comp Store #2[4] as two better-stocked convenience stores located 0.3 miles and 0.92 miles away, respectively, from the Store.  (A.R. 283); *see* A.R. 95-113 (store visit report for Comp Store #2) and 114-31 (store visit report for Comp Store #1). ROD noted that both stores had inventory that consisted of canned goods, bread, cereal, some fresh produce, deli products, dairy products, baby formula, soda, snacks, and candy, and both stores accepted WIC.  (A.R. 283).  ROD compared the Store's transactions to the transactions at these two stores and found that the Store had higher suspicious transactions in both Scan B2 and Scan F, had far more high-dollar transactions in the breakdowns by dollar amount, and had higher average transaction amounts, despite the other two stores' better inventory.  (A.R. 284-86).

ROD also reviewed the shopping patterns of selected households involved in suspicious transactions during the review period and found that those households were also shopping at larger better-stocked stores but spending more at the Store.  (A.R. 287-293).  ROD also noted that, although all three of the households analyzed lived closer to a superstore than the Store, they bypassed the superstore to spend more money at the Store.  (A.R. 294).

Following this extensive review, ROD concluded that the evidence warranted issuing a trafficking charge letter to the Store.  (A.R. 294).

Denise Thomas, Section Chief for ROD, sent a letter to Plaintiffs dated November 26, 2019 (the "Charge Letter").  (A.R. 295-297).  The Charge Letter informed Plaintiffs that an analysis of the EBT transactions for April through September 2019 established clear and repetitive

---

[4]    The identities of these stores are disclosed in the unredacted Administrative Appeal Record.

patterns of unusual, irregular, and inexplicable activity for the Store's type.  (A.R. 295).  It also informed Plaintiffs that the Store was being charged with trafficking, as defined by 7 C.F.R. § 271.2 and was being considered for a permanent disqualification from the program.  (A.R. 295).  The Charge Letter detailed the suspicious transactions.  (A.R. 295).  The suspicious transaction details were attached to the Charge Letter, broken down by suspicious patterns.  (A.R. 296-301).  The Charge Letter explained Plaintiffs' right to reply to the charges and present "any information, explanation, or evidence regarding these charges" either in person or by phone to Anthony Pesini, an FNS employee, within ten days of the receipt of the Charge Letter.  (A.R. 296-97).  It also stated that the Store could request a CMP in lieu of permanent disqualification.  The Charge Letter informed Plaintiffs that, to be eligible for the CMP, Plaintiffs must present information, within ten days of the receipt of the Charge Letter, that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i).  (A.R. 295-96).  Plaintiffs received the letter on November 27, 2019.  (A.R. 302).

### C.   THE STORE CHALLENGES THE CHARGE LETTER AND FNS DETERMINES THAT THE STORE SHOULD BE DISQUALIFIED FROM SNAP

Plaintiffs, through their accountant, responded by letter dated December 6, 2019 (the "Response Letter").  (A.R. 304).  The Response Letter provides, in full:

> This letter is written on behalf of our clients, Brothers Convenience Store, Hesham Ghaleb and Maged A. Ghalib to advise you that the random computer analysis of the alleged trafficking detected by USDA computer from April 1, 2019 to about April 19, 2019 is untrue.
>
> We have attached the purchases and transactions by the card owners. We also have attached copies of the company's Z1 report of the EBT cards, bank statements, pictures of the store merchandises to advert that Trafficking of any kind is false.
>
> Therefore, we request that you quash the allegations on your letter dated November 26, 2019 after you fairly review the attachments herein.
>
> Thank you for your anticipated cooperation.

(A.R. 304).  Plaintiffs attached photos (A.R. 305-321); register receipts (A.R. 322-31); and bank records (A.R. 332-377).

ROD analyzed the information submitted by the Plaintiffs and the information it compiled before sending the Charge Letter and stated that the Store was a typically stocked convenience store with inventory consisting mostly of soda and snacks, with some staple foods such as frozen foods, bread, dairy products, cereal, and baby formula.  (A.R. 380).  ROD stated that is was improbable that a household would shop at the Store between three and five times in a one and one-half day span, spending as much as $200.  (A.R. 381).  ROD similarly found that Scan F's high-dollar transactions unlikely.  (A.R. 381-82).  ROD noted that Plaintiffs did not explain the transactions other than to say they were false.  (A.R. 382).  ROD reviewed the invoices/bank credit card statements and, based on the purchases that could be verified as food items, found that the Store had enough inventory to justify the redemptions based on a 40% markup and 20% cash/credit card sales.  (A.R. 382-83).  If, however, the cash/credit card sales increased even by 5%, then there was not sufficient inventory.  (A.R. 383).  ROD noted that the register receipts could not provide any information about the transactions because they were just dollar amounts with no itemization.  (A.R. 383).  Finally, ROD noted that there was a significant reduction in redemptions and flags in Scans B2 and F after the Store received the Charge Letter.  (A.R. 384).  Plaintiffs did not request or provide any evidence to support eligibility for the CMP in lieu of permanent disqualification.  (A.R. 385-86).  Based on all of this, ROD determined that it was more likely true than not that the suspicious transactions stemmed from trafficking and that permanent disqualification was the appropriate penalty.  (A.R. 386).

FNS issued its determination letter on February 25, 2020 (the "Determination Letter"). (A.R. 387-388).  The Determination Letter informed the Plaintiffs of FNS's determination that

the violations alleged in the Charge Letter occurred and of the imposition of a permanent disqualification for the trafficking violations.  (A.R. 387).  The Determination Letter stated that the Store was ineligible for a CMP because Plaintiffs failed to submit sufficient evidence to prove that the Store had established and implemented an effective compliance program to prevent violations of SNAP.  (A.R. 387).  The Store was advised of the right to appeal to the Agency's Administrative Review Branch ("ARB") and notified that such appeal must be filed within ten days of receiving the Determination Letter.  (A.R. 387).  Plaintiffs were informed that the Store could not accept SNAP benefits until after a decision was rendered.  (A.R. 387-88).

### D.   THE STORE SEEKS FURTHER ADMINISTRATIVE REVIEW AND THE PERMANENT DISQUALIFICATION IS UPHELD

On March 2, 2020, the Plaintiffs sent a one-page, eight-line letter requesting administrative review.  (A.R. 389).  That letter provides, in full:

> Hesham A Ghaleb, Maged A. Ghaleb, themselves and on behalf of Brothers Convenience Store, request a review on the adverse decision made by Denise Thomas against the establishment. The adverse decision is dated February 25, 2020.
>
> The parties provided all the documents pertaining to each of the sale and are unable to ascertain how the legitimate transactions are being classified as trafficking.
>
> Whereas, it is requested that the adverse decision be set aside.

(A.R. 389).

On March 9, 2020, Administrative Review Officer ("ARO") Robert Deegan sent a letter to Plaintiffs to confirm receipt of the Store's request for an administrative review.  (A.R. 394). The letter also informed Plaintiffs that if they wished to submit any additional information, it must be postmarked by March 30, 2020.  (A.R. 394).  Plaintiffs received the letter on March 10, 2020. (A.R. 395).  Plaintiffs did not submit any additional information.  (A.R. 398).

The ARO reviewed all the information Plaintiffs submitted and on May 5, 2020, the Agency issued its Final Agency Decision ("FAD"), concluding that the record contained sufficient evidence to support a finding that the permanent disqualification from participation in SNAP was appropriate.  (A.R. 401-14).

The ARO summarized the controlling statutes and regulations, the charges, the evidence and contentions submitted by the Store, and the case assembled by The Office of Retailer Operations and Compliance ("ROC")[5].  (A.R. 401-03).  After reviewing the Store's background and Store Visit Report, the ARO found that the Store Visit Report and photos showed very narrow aisle as well as some marginally stocked shelves, and display racks and coolers and that the quantity and variety of the Store's staple food inventory was less than what was documented in previous store visits.  (A.R. 404-05).  The ARO, in noting that the Store carried a limited selection of infant formula, commented that most SNAP households with infants and small children were also WIC participants and therefore likely to purchase these items at a WIC-authorized firm rather than using SNAP benefits at the Store.  (A.R. 405).

The ARO then reviewed the attachments to the Charge Letter.  As for Scan B2, the ARO stated that the transactions documented in this scan were unusual and often used as a method of avoiding single high-dollar transactions that cannot be supported by the store inventory or structure.  (A.R. 406).  After noting that the Plaintiffs did not provide any documentation or explanation to support the legitimacy of the transactions, the ARO stated these transactions were suspicious because they are not consistent with households returning to purchase forgotten items, household members shopping together but making separate purchases, households dividing

---

[5]     ROD changed its name during the administrative of this case to the Office of Retailer Operations and Compliance or ROC.

purchase, or households making separate purchases to check their balances before making other purchases, since all of the transaction sets occurred more than three hours apart, and many of the subsequent purchases are as large if not larger than the initial purchase.  (A.R. 406).  The ARO also stated that Plaintiffs did not explain these sizable repeat transactions when there were many larger retail food stores nearby where the households were also shopping.  (A.R. 406).  This included, among other stores, one superstore and one medium grocery located within three and four blocks, respectively, from the Store.  (A.R. 406).  The ARO stated that it was not unusual for some households to conduct multiple transactions in a short period, but that it was unusual for the total dollar amounts for the transaction sets to be so much above the county averages.  (A.R. 406).  The ARO found it questionable that the households were shopping at a variety of nearby comparably sized or larger food stores within 24-72 hours of shopping at the Store yet spending more at the Store than at the larger stores, which were likely to be better shocked.  (A.R. 407-08).

The ARO found the Scan F transactions questionable given the Store's inventory documented in the Store Visit Report and the frequency of the transactions.  (A.R. 408).  The ARO stated that the substantial number of high-dollar transactions were uncharacteristic for a very small convenience store and were substantially higher than the average SNAP transaction for convenience stores in Baltimore City.  (A.R. 408-09).  The ARO again noted that the households involved were also shopping at full-line superstores and supermarkets that offer greater quantity and variety of SNAP eligible food items at better prices than customers could find at the Store.  (A.R. 409).  The ARO found the Store's transaction patterns breakdown unusual as compared to the Baltimore City convenience store averages.  (A.R. 409).  The Store's average SNAP transaction dollar volume and SNAP transaction count were much larger than the city average, yet its average transaction dollar amount was smaller.  (A.R. 409).  The ARO stated that this combination

indicates that the Store may be dividing larger transactions into multiple smaller transactions to circumvent detection.  (A.R. 409).  The ARO found that none of the nearby stores had similar deviations.  (A.R. 409).  The ARO stated that the transactions were not suspicious because they exceeded a set dollar amount, but because were inconsistent for this type of store and store stock. (A.R. 410).

The ARO also reviewed Plaintiffs' submissions against the Scan F transactions.  The ARO agreed with ROC's analysis of bank statements that, although there was sufficient inventory to support the transactions, that alone was not sufficient to explain the suspicious transactions.  (A.R. 411).  The ARO questioned the store photos Plaintiffs submitted, as they showed significantly greater quantities and varieties of staple and accessory food items than were present during the Store Visit.  (A.R. 411).  The ARO stated the cash register receipts were not itemized so there was no way to know what the Store actually sold.  (A.R. 411).

Finally, the ARO discussed the pronounced fluctuation in SNAP redemptions and suspicious transactions following receipt of the Charge Letter, a "clear indication of trafficking since, if trafficking were not occurring, there would be no abnormal fluctuations in redemption amounts."  (A.R. 411).

The ARO reviewed ROC's determination that the Store was ineligible for a CMP because the Store failed to submit evidence to demonstrate that is had established and implemented an effective compliance policy and program to prevent SNAP violation and thus sustained ROC's decision not to impose the CMP in lieu of disqualification.  (A.R. 413).

The ARO concluded, based on all of evidence ROD compiled and information the Store submitted, that ROC's decision to disqualify the Store permanently from participation in SNAP should be sustained.  (A.R. 413-414).

The Final Agency Decision explained Plaintiffs' further appeal rights. (A.R. 414). Plaintiffs received the FAD on May 6, 2020. (A.R. 415). Plaintiffs filed the Complaint on May 29, 2020.

## IV.   APPLICABLE LEGAL STANDARDS

### A.   SCOPE OF JUDICIAL REVIEW

After receiving notice of the final action by the Agency, an aggrieved retailer may seek judicial review, and the court determines, *de novo*, the validity of the administrative action. 7 U.S.C. § 2023(a)(13), (15); 7 C.F.R. § 279.7. This *de novo* review requires that "the district court … 'reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings.'" *Ibrahim v. United States*, 834 F.2d 52, 53-54 (2d Cir. 1987) (quoting *Modica v. United States,* 518 F.2d 374, 376 (5th Cir. 1975)).

In this context, *de novo* review "means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur." *AJS Petroleum, Inc. v. United States*, No. 1:11-cv-01085, 2012 WL 683538, at *4 (D. Md. Mar. 1, 2012); *see also Negash v. United States*, 1:17-cv-01954, 2018 WL 722481, at *3 (D. Md. Feb. 5, 2018), *aff'd*, 772 F. App'x 34 (4th Cir. 2019); *2341 E. Fayette St., Inc. v. United States*, No. 1:05-cv-00974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005) (Motz, J.).

This *de novo* provision "does not, however, entitle plaintiffs to reach a trial on the merits of their cause of action." *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000); *see also Mahmood v. United States*, No. 1:12-cv-00228, 2012 WL 3038638, at *2 (D. Md. July 24, 2012) (same). Congress simply "intended … [that] the district court would not be bound by the administrative record." *Bon Supermarket & Deli*, 87 F. Supp. 2d at 598. In trying to disprove

the violations, the retailer is not limited to the record before the Agency, but may rely on other evidence. *See AJS Petroleum, Inc.*, 2012 WL 683538, at *4.

As a result, "summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact." *Bon Supermarket & Deli*, 87 F. Supp. 2d at 599; *see Idias v. United States*, 359 F.3d 695, 696 (4th Cir. 2004) (affirming district court's award of summary judgment in case involving permanent disqualification for food stamp trafficking); *see also, e.g., Freedman v. USDA*, 926 F.2d 252, 261 (3d Cir. 1991) (holding that the statutory requirement of a trial *de novo* "is compatible with a summary judgment disposition if there are no material facts in dispute"). The grant *of pre-discovery* summary judgment is not incompatible with the *de novo* provisions of 7 U.S.C. § 2023, as evidenced by the plethora of very recent cases granting such relief. *See, e.g., Negash*, 2018 WL 722481, at *4; *AJS Petroleum, Inc.*, 2012 WL 683538, at *4-5; *see also See J & L Liquor, Inc.*, 2017 WL 4310109, at *7; *Rosario v. United States*, No. 3:14-cv-00907, 2017 WL 4316093, at *4 (D. Conn. Sept. 27, 2017); *Suuqa Bakaro Grocery v. USDA*, No. 2:16-cv-00254, 2017 WL 3141919, at *5 (D. Me. July 24, 2017); *Shanaa v. United States*, No. 2:15-cv-00042, 2017 WL 2838150, at *4 (E.D. Wis. June 30, 2017); *Sky Grocery, LLC v. USDA*, No. 3:15-cv-01082, 2017 WL 1054484, at *6 (D. Conn. Mar. 20, 2017); *Mareida v. United States*, No. 4:13-cv-01124, 2016 WL 7736585, at *4 (S.D. Tex. Aug. 16, 2016); *Fajardo v. United States*, No. 2:15-cv-04790, 2016 WL 4010080, at *4 (C.D. Cal. July 25, 2016); *Savera Super Store, LLC v. United States*, No. 1:14-cv-00554, 2016 WL 55274, at *5. (D.N.H. Jan. 5, 2016).

Additionally, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." *Duchimaza v. United States*, 211 F. Supp. 3d 421, 439 (D. Conn. 2016). The Fourth Circuit has held that "the scope of judicial review extends to the period of administrative sanction." *Cross v. United States*,

512 F.2d 1212, 1215 (4th Cir. 1975).  Reviewing courts apply the "arbitrary and capricious" standard to determine whether the sanction imposed is valid.  *See, e.g.*, *Mahmood*, 2012 WL 3038638, at \*2; *2341 E. Fayette St., Inc.*, 2005 WL 2373696, at \*1.

In sum, judicial review is conducted in two stages.  First, the retailer bears the burden of establishing by a preponderance of evidence that the violations found by the Agency did not occur. Without a showing by the plaintiff that meets this burden of persuasion, the reviewing court must uphold the Agency's findings as valid.  Second, if the court concludes that a violation occurred, it applies the "arbitrary and capricious" standard in determining whether the sanction imposed is valid.

### B.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") serves to test the legal sufficiency of the complaint.  *See, e.g.*, *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  Although courts must generally accept as true the allegations of a complaint, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief ….” *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted).

### C.   MOTION FOR SUMMARY JUDGMENT

As noted *supra* Part IV.A., summary judgment is a proper way to dispose of a request for review under the Food and Nutrition Act.  Summary judgment must be granted “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.”  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (“[T]he plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.”).  As the Supreme Court has emphasized, “[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.”  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  On those issues on which the nonmoving party will have the burden of proof, it is the responsibility of the nonmoving party to confront the motion for summary judgment with evidence to show a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.

Here, the extra-pleading material submitted in the Administrative Appeal Record is both comprehensive and will enable a rational determination of Plaintiffs’ claims through established summary judgment practice.  Notably, at least five judges of this Court have determined—in challenges to permanent disqualifications for SNAP trafficking—to consider the administrative

records and grant the Government's motions for summary judgment.  *See Negash*, 2018 WL 722481, at *4 (Bennett, J.); *7-Eleven, Inc. v. United States*, No. 1:15-cv-00543, 2016 WL 5107129, at *3-4 (D. Md. Jan. 29, 2016) (Russell, J.); *Mahmood*, 2012 WL 3038638, at *1 & n.4 (Nickerson, J.); *AJS Petroleum, Inc.*, 2012 WL 683538, at *5 (Legg, J.); *Bernal Deli Grocery v. United States*, 1:10-cv-1761, ECF 13, at 6-7 (D. Md. Aug. 26, 2011) (Garbis, J.).

## V.   ARGUMENT

### A.   THE COURT SHOULD DISMISS THE COMPLAINT, UNDER RULE 12(b)(6), FOR FAILURE TO STATE A CLAIM

The crux of the Complaint is Plaintiffs' contention that the "the evidence is not sufficient to support Defendant's Permanent Disqualification …."  Complaint ¶ 15.  Aside from these conclusory statements, Plaintiffs provide no factual support which might contradict the administrative findings of trafficking.  Because these conclusory averments are insufficient to state a claim, this Court should dismiss the Complaint.

*First*, as for Count I, Plaintiffs argue that "[t]he Defendant lacks any direct evidence, whatsoever, that trafficking occurred."  If Plaintiffs argue that FNS must catch them "red handed" to charge them with trafficking, they are wrong.  *See AJS Petroleum, Inc.*, 2012 WL 683538, at *5 (quoting *Young Choi Inc*, 639 F. Supp. 2d at 1178 (D. Haw. 2009)) ("FNS does not need to provide evidence that a store was caught 'red-handed' engaging in a food stamp violation in the summary judgment stage.").  The starting point for FNS's trafficking determination was the Store's own EBT data, and the Fourth Circuit has conveyed that there can be "little question" that it is proper for the Agency to base a disqualification determination on that EBT data.  *See Idias*, 359 F.3d at 698.  The Court reached this determination, explaining that Congress expressly provided that the Agency may promulgate regulations which provide for disqualification upon its review of "evidence obtained through a transaction report under an electronic benefit transfer system."  7

U.S.C. § 2021(a); *see also, e.g.*, *Duchimaza*, 211 F. Supp. 3d at 432-33 ("[T]he Government may permanently disqualify a retailer on the basis of EBT data.").  And Plaintiffs' contention that "Defendant's withdrawal of Plaintiff's SNAP authorization represents agency action beyond the scope of authority granted by Congress to FNS," Complaint ¶ 21, ignores the fact that, under the pertinent statutes and regulations, where trafficking has been proven, permanent disqualification is *the* sanction Congress prescribed.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time *must be* permanently disqualified.") (emphasis added).

   *Second*, as for Count II regarding a CMP, Plaintiffs argue that FNS "denied Plaintiffs['] eligibility for a [CMP]."  Complaint ¶ 33.  In the Charge Letter, FNS advised Plaintiffs:  "If you request a CMP, you must meet each of the four criterial listed and provide the documentation as specified [in the regulations] within 10 calendar days of your receipt of this letter."  (A.R. 295).  Although Plaintiffs responded to the Charge Letter within ten days with a one-page letter from their accountant, in that letter, Plaintiffs did not (i) request a CMP or (ii) submit any evidence— let alone substantial evidence—that it had established and implemented an effective compliance policy and program to prevent SNAP violations.  (A.R. 304).  *See* 7 C.F.R. § 278.6(i).  As a result, because it did not request a CMP or provide evidence that would support a conclusion that a CMP was an appropriate sanction, FNS correctly decided that Plaintiffs were ineligible for a CMP, and thus Count II fails to state a claim.

   Third, as for Count III, Plaintiffs allege that "[t]he Inspector's failure to inform the Plaintiffs that they were under investigation … violated Plaintiffs['] due process rights …."  Plaintiff does not elaborate as to whether they assert a substantive or procedural due process claim, but either fails.  As for substantive due process, courts have consistently held the SNAP-

disqualification scheme to be constitutional on substantive due-process grounds. *See, e.g.*, *Negash*, 2018 WL 3428716, at *5 (recognizing that "the Fourth Circuit has held that the SNAP-disqualification scheme is constitutional on substantive due-process grounds"); *Tikabo v. United States*, No. 4:16-cv-02197, 2017 WL 5075275, at *6 (S.D. Tex. Aug. 21, 2017) ("[C]ourts have found that the SNAP disqualification process complies with substantive due process requirements."); *Sky Grocery, LLC v. USDA-FNS*, No. 3:15-cv-01082, 2017 WL 1054484, at *10 (D. Conn. Mar. 20, 2017) ("Despite Plaintiff's argument to the contrary, its substantive due process rights have not been infringed by imposition of disqualification as a penalty for trafficking."); *Razzak v. United States*, No. 1:13-cv-00207, 2014 WL 582079, at *5 (W.D. Tex. Feb. 13, 2014) (upholding "the SNAP disqualification scheme as constitutional in light of substantive due process challenges"). The same is true for procedural due process. *See Hanif v. United States*, No. 4:15-cv-02718, 2017 WL 447465, at *7 (S.D. Tex. Feb. 2, 2017) ("[C]ourts have rejected procedural due process challenges to the SNAP disqualification scheme."); *see also Badruddin v. United States*, No. 1:17-cv-05542, 2019 WL 3855322, at *6 (N.D. Ga. July 15, 2019) (holding, in the SNAP disqualification context, that "the law is clear that Plaintiffs' right to de novo judicial review satisfies due process"); *SS Grocery, Inc. v. USDA*, 340 F. Supp. 3d 172, 186 (E.D.N.Y. 2018) (holding that "Plaintiffs' due process claim is without merit or several reasons," "[b]ut most obviously, Plaintiffs' procedural due process rights are not infringed upon because "[t]he trial de novo provision clearly afford[s] full procedural due process."" (quoting *Ibrahim*, 834 F.2d at 54). Plaintiffs' due process claim fails on its face, and thus Count III fails to state a claim.

**B.    ALTERNATIVELY, THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR THE DEFENDANT BECAUSE THE RECORD CLEARLY DEMONSTRATES TRAFFICKING OF SNAP BENEFITS AND BECAUSE THE PENALTY OF DISQUALIFICATION WAS NOT ARBITRARY AND CAPRICIOUS**

The EBT data provides substantial and unequivocal evidence that the Store violated the statutes and regulations governing SNAP by trafficking in SNAP benefits.  The Agency's decision that the Store engaged in trafficking is supported by the Administrative Appeal Record, and Plaintiffs offer no explanations (other than bare-bones denials) that could raise a genuine issue of material fact.  Further, under the circumstances of this case, permanent disqualification was the only available sanction as a matter of law, and, as such, the Agency's decision to disqualify the Store permanently from SNAP was not arbitrary and capricious and must be upheld.

**i.    *Count I:  The Agency's Determination that the Store Engaged in Trafficking Is Fully Supported by the Administrative Record***

As detailed above, the Agency identified two categories of suspicious transactions probative of trafficking: (i) repetitive transaction in a set period by the same household/account ("Attachment 1" on A.R. 298-99) and (ii) high-dollar transactions ("Attachment 2" on A.R. 300-01).  In the Final Agency Decision, the Agency explained in detail and provided substantial documentation to support the basis for concluding that the Store engaged in trafficking as for each of the patterns of suspicious transactions.

Before discussing each category of suspicious transactions, however, it must be noted again that it is well-settled that a store can be held liable for trafficking even without direct evidence thereof, *i.e.*, even if the store was not caught exchanging EBT benefits for cash "red handed."  *See AJS Petroleum, Inc.*, 2012 WL 683538, at *5 (quoting *Young Choi Inc.*, 639 F. Supp. 2d at 1178; *see also Savera Super Store, LLC v. United States*, No. 1:14-cv-00554, 2016 WL 55274, at *1 (D.N.H. Jan. 5, 2016) ("[S]ummary judgment may be appropriate based on that record evidence even in the

absence of 'red handed' evidence of trafficking."); *Nadia Int'l Mkt. v. United States*, No. 5:14-cv-82, 2015 WL 7854290, at *5 (D. Vt. Dec. 2, 2015) ("The Agency … need not catch a store 'red-handed' to support its determination of trafficking.").  As explained below, consistent with the statutory and regulatory scheme governing SNAP, the Agency's decision to suspend the Store permanently stemmed from "facts established through on-site investigations, inconsistent redemption data, [and] evidence establish through a transaction report under an electronic benefit transfer system," and should thus be upheld. *See* 7 U.S.C. § 2021(a)(2); *see also* 7 C.F.R. § 278.6(a).

### a.  Rapid and Repetitive Transactions in a Short Period, from the Same Household, Evidence Trafficking

ROD's investigation, conducted between the months of April through September 2019, uncovered no less than forty-three separate instances of rapid and repetitive transactions from fifteen sets of transactions from the same household in a very short period.  (A.R. 298-99).  These transactions "are a common tactic by stores trafficking in food stamps to hide their tracks." *Capellan v. United States*, No. 1:17-cv-09342, 2020 WL 1047907, at *5 (S.D.N.Y. Mar. 4, 2020).  The period from the initial to the later purchase ranged from less three hours to about thirty-four hours, with the aggregate purchases ranging from $75.11 to $204.25.  (A.R. 298-99).  And the frequency of these same-household rapid-and-repetitive transactions were not abnormally high in the abstract; instead, ROD determined that the Store had significantly more of these transactions than two nearby stores with better inventory.  More specifically, while the Store had fifteen sets of same-household rapid-and-repetitive transactions (forty-three transactions total), Comp Stores #1 and #2 both had zero.  (A.R. 284); *see Almonte Mkt. v. United States*, No. 3:18-cv-30035, 2020 WL 93994, at *7 (D. Mass. Jan. 8, 2020) ("The significant variance between the average amounts of Plaintiff's suspicious EBT transactions and the average amounts of comparable small grocery stores' EBT transactions is strong evidence that Plaintiff trafficked in SNAP benefits.").

Courts have routinely granted summary judgment upholding permanent disqualification from SNAP where the Agency relied on, among other things, EBT data showing that the stores had rapid and repetitive EBT transactions. *See, e.g.*, *Negash*, 2018 WL 722481, at *2, *3 (granting summary judgment in the Government's favor where EBT data revealed "rapid and repetitive transactions in a short period from the same household"); *Young Choi Inc.*, 639 F. Supp. 2d at 1178 (granting summary judgment in the Government's favor where EBT data revealed "rapid and multiple transactions"); *Hanna v. United States*, No. 2:04-cv-74627, 2007 WL 1016988, at *2 (E.D. Mich. Mar. 30, 2007) (granting summary judgment in the Government's favor where EBT data revealed "a number of instances of a single food stamp recipient engaging in multiple transactions within a relatively short time period"); *Duchimaza*, 211 F. Supp. 3d at 434 (granting summary judgment in the Government's favor where EBT data showed "EBT transactions where multiple withdrawals were made from the account of a single SNAP household within 24 hours").

In the face of this detailed evidence, Plaintiffs only response at the administrative level was that the documentation they provided "advert that Trafficking of any kind is false" and that they "are unable to ascertain how the legitimate transactions are being classified as trafficking."  (A.R. 304, 389). *See Capellan*, 2020 WL 1047907, at *5 (granting summary judgment to the Government where "Plaintiffs have not put forward any explanation as to … the rapid-fire transactions"); *see also Almonte Mkt. v. United States*, No. 3:18-cv-30035, 2020 WL 93994, at *6-7 (D. Mass. Jan. 8, 2020) (holding that "Plaintiff's general denial of the trafficking charge … [is] easily dismissed as conclusory").  Plaintiffs do not allege that the transactions identified in Attachment 1 did not occur.  *See Badruddin v. United States*, No. 1:17-cv-05542, 2019 WL 3855322, at *4 (N.D. Ga. July 15, 2019) (granting summary judgment where FNS identified certain transactions evidencing trafficking and "Plaintiffs did not, and do not, dispute that these transactions occurred ….").

Although Plaintiffs submitted various documentation, the most that the document shows is that perhaps the Store had sufficient inventory to make the sales.  But having sufficient inventory to make the sales theoretically does not explain how or why the same households were making rapid-and-repetitive transactions in a short period.

Relying on the detailed EBT data, and without any credible explanation or documentation showing the contrary, the Agency correctly determined that the data in Attachment 1 evidences trafficking.  Evidence of dozens of rapid and repetitive transactions from the same household in a very short period supports the Agency's conclusion that such purchases were not legitimate transactions.

### b.  High-Dollar Transactions also Evidence Trafficking

ROD's investigation also uncovered no less than ninety-seven transactions where excessively large purchase-transactions were made.  (A.R. 95-100).  "An unusual number of high-dollar transactions is likewise an indicator of trafficking based on Government analysis of stores caught in trafficking violations during on-site investigations."  *Duchimaza*, 211 F. Supp. 3d at 437. As with the same-household rapid-and-repetitive transactions, the frequency of these high-dollar transactions were not abnormally high in the abstract; instead, ROD determined that the Store had significantly more of these transactions than nearby comparable stores.  More specifically, while the Store had ninety-seven high-dollar transactions, Comp Stores #1 and #2 had fourteen and thirty four, respectively.   (A.R. 284).   And the Store had significantly more high-dollar transactions in every price range compared to Comp Stores #1 and #2.  (A.R. 285); *see Almonte Market*, 2020 WL 93994, at *7 ("The significant variance between the average amounts of Plaintiff's suspicious EBT transactions and the average amounts of comparable small grocery stores' EBT transactions is strong evidence that Plaintiff trafficked in SNAP benefits.").

Courts have routinely granted summary judgment upholding permanent disqualification from SNAP where the Agency relied on, among other things, EBT data showing multiple instances of high-dollar transactions for the type of store.  *See, e.g.*, *Negash*, 2018 WL 722481, at *2; *S. Hill Mkt. v. United States*, No. 2:19-cv-00073, 2020 WL 4043819, at *3-4 (E.D. Wash. July 17, 2020) (granting summary judgment in the Government's favor where "FNS's disqualification decision was the number of high-value SNAP transactions at the Market compared to retailers of similar size and capacity in the same area" and where plaintiff's explanations were "generalized explanation[s] for large expenditures lacking any specific evidence in the record"); *Shanaa*, 2017 WL 2838150, at *4 (granting summary judgment in the Government's favor where EBT found "excessive numbers of large dollar purchases," which were "inconsistent with the store's inventory which is predominately comprised of low value food items") (internal quotation marks omitted).

Again, in the face of this detailed evidence, Plaintiffs' only response at the administrative level was that the documentation they provided "advert that Trafficking of any kind is false" and that they "are unable to ascertain how the legitimate transactions are being classified as trafficking." (A.R. 304, 389).  Plaintiffs do not allege that the transactions identified in Attachment 2 did not occur.  And as with the same-household rapid-and-repetitive transactions, although Plaintiffs submitted various documentation, that documentation does not show how or why customers were often making high-dollar transactions at the poorly stocked Store.[6]

The Agency rightly rejected the Store's bare-bones denials, which did not address or deny the data in Attachment 2, which data uncovered ninety-seven high-dollar transactions.  Evidence

---

[6]   Additionally, an analysis of three households in the same apartment complex revealed that those households lived closer to a superstore (with larger stock and cheaper prices), yet were bypassing that superstore and spending more than twice as much money at the Store than the superstore.  (A.R. 287-94).

of such high-dollar transactions also supports the Agency's conclusion that such purchases were not legitimate transactions.

For these reasons, the Agency correctly decided that the Store had not met its burden of showing that each of the suspicious transactions was not actually the store trafficking in SNAP benefits, and thus the Court should grant summary judgment in Defendant's favor in Count I of the Complaint.

ii.    *Count II:  The Agency's Decision to Disqualify the Store Permanently Is Mandated by Statute and Is thus Not Arbitrary and Capricious*

In Count II, Plaintiffs contend "that the evidence presented in sufficient to support [the Store's] eligibility for a civil penalty in lieu of Permanent Disqualification."  Complaint ¶ 35. Plaintiffs' challenge to the Agency's sanction fails, as the sanction of permanent disqualification is mandated by statute and thus cannot be arbitrary and capricious.

Where trafficking has been proven, permanent disqualification is *the* sanction Congress prescribed.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time *must be* permanently disqualified.") (emphasis added).  Only when FNS determines that the firm has submitted substantial evidence showing that it had established and implemented an effective compliance policy and program (as well as its non-involvement in the trafficking) can FNS impose a CMP in lieu of permanent disqualification.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i).

Here, the Charge Letter stated that the Store could request a CMP in lieu of permanent disqualification, but informed Plaintiffs that, to be eligible for the CMP, Plaintiffs must present information that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i). (A.R. 295-96).  Although Plaintiffs responded timely to the Charge Letter, Plaintiffs' one-page response simply stated that the Store "advert[ed] that Trafficking of any kind is false" and

"untrue." (A.R. 304). The one-page letter did not provide any argument that the Store had implemented an effective compliance policy and program to prevent SNAP violations, *see* 7 C.F.R. § 278.6(i), or address any of the four criteria FNS evaluates to determine whether to impose a CMP in lieu of permanent disqualification. Nor did the Store, in the one-page letter, request that FNS consider a CMP in lieu of permanent disqualification, as required by regulation. *See* 7 C.F.R. § 278.6(b)(2)(iii) (providing that "if a firm fails to request consideration for a civil money penalty in lieu of a permanent disqualification for trafficking and submit documentation and evidence of its eligibility within the 10 days specified … , the firm shall not be eligible for such a penalty"). As Plaintiffs did not request such consideration and provided no evidence, information, or argument in support thereof, the Court should uphold the Agency's decision to disqualify the Store permanently—and not impose a CMP. Thus, Defendant is entitled to summary judgment on Count II of the Complaint. *See, e.g., Mahmood*, 2012 WL 3038638, at *3 ("[T]he Court agrees that the permanent disqualification of Plaintiff from participation in the SNAP program is not arbitrary or capricious and is, in fact, mandated by the statute.").

### iii. Count III: The Store's Permanent Disqualification Does Not Violate Plaintiffs' Substantive Due Process Rights, and the Judicial Review Provisions Comport with Procedural Due Process

In Count III, Plaintiffs press a due process claim, albeit without specifying whether it is a substantive or procedural due process claim. As Defendant explains above, *see supra* Part V.A., any substantive or procedural due process claims fail. Defendant incorporates those arguments here by reference. For the same reason the Court can dismiss Count III under Rule 12(b)(6), the Court can also grant summary judgment in Defendant's favor on Count III.

## VI.    <u>CONCLUSION</u>

Plaintiffs have offered nothing more than bare-bones, generalized, conclusory denials that the Store did not engage in trafficking.  This Court has held, in granting summary judgment in the Government's favor and upholding the permanent disqualification of a SNAP retailer, that such "generalized … explanations" fall "far short of the specificity required to defeat summary judgment."  *See AJS Petroleum, Inc.*, 2012 WL at 683538, at \*6; *see also Rainbow Quick Stop Grocery v. United States*, No. 1:18-cv-01096, 2019 WL 7496255, at \*5 (N.D. Ga. Oct. 10, 2019) (granting summary judgment in the Government's favor where "Plaintiffs … merely asserted, without citation to authority, that Defendant has no admissible evidence of trafficking").  Plaintiffs cannot meet their burden of establishing that each of the suspicious transactions was not actually the store trafficking in SNAP benefits.

For the reasons set forth above and those appearing in the Administrative Appeal Record, Defendant requests that this Court grant the Motion and either dismiss the Complaint or grant summary judgment in its favor on all claims.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____
Alan C. Lazerow (Bar No. 29756)
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
(410) 209-4800
Alan.Lazerow@usdoj.gov

*Counsel for Defendant*

OF COUNSEL:
Virginia Henning
Attorney Advisor
United States Department of Agriculture
Office of the General Counsel
Harrisburg, Pennsylvania 17108