IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BROTHER CONVENIENCE STORE, INC., et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. GLR-20-1346 |
| | * | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | * | |
| | * | |
| Defendant. | * | |
| | *** | |

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant United States Department of Agriculture's ("USDA" or the "Agency") Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 12). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Motion, which it construes as a motion for summary judgment.

## I.     BACKGROUND

Plaintiff Brother Convenience Store, Inc. ("Brother Convenience" or the "Store") is a small convenience store in Baltimore, Maryland. (Compl. ¶ 9, ECF No. 1). Brother Convenience is owned by Plaintiffs Hesham A. Ghaleb ("Hesham") and Maged A. Ghaleb ("Maged") (the "Ghalebs") (together with the Store, "Plaintiffs"). (Id. ¶ 2). The Store was formerly authorized to accept payments from beneficiaries of the Supplemental Nutrition Assistance Program ("SNAP"), commonly known as the food stamp program, pursuant to the Food and Nutrition Act of 2008, 7 U.S.C. § 2011 et seq. (the "Food and Nutrition Act").

(Id. ¶ 10). Before outlining the facts of the present case, the Court will briefly describe the regulatory framework of SNAP.

A.      **Regulatory Framework**

The mission of the SNAP program is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. To advance this mission, SNAP aims to increase the food purchasing power of eligible households by supplementing the funds families have available to spend on food with food stamp allotments, which may be used for purchasing food items at authorized retail food stores. See id. § 2013. SNAP benefits can be redeemed only for purchases of food; non-food purchases are not eligible for SNAP benefits. See id.; see also 7 C.F.R. § 271.2.

The SNAP program is administered by USDA's Food and Nutrition Service ("FNS"). See 7 C.F.R. § 271.3. Through FNS, a household's SNAP benefits are delivered through electronic benefit transfer ("EBT") cards. See 7 U.S.C. § 2016(j). EBT cards operate similarly to a debit card issued by a bank. At the beginning of each month, a SNAP beneficiary's EBT card is credited with a dollar amount of SNAP benefits for that month. The beneficiary may then use the EBT card at authorized retail food stores to purchase eligible food items. Id. § 2013(a). Retail food stores have one or more EBT terminals in their stores. As a purchase is made, the retailer swipes the EBT card through the EBT terminal, the recipient enters a personal identification number code on a keypad, and the amount of the purchase is deducted from the beneficiary's EBT card balance. The EBT terminal generates a receipt for each transaction and the balance remaining in the

recipient's account for the month is displayed on the receipt. The amount of the recipient's purchase is then electronically credited within two banking days to the retail food store owner's bank account. See id. (providing that only retailers approved by USDA may engage in SNAP benefit transactions); 7 C.F.R. § 278.1 (describing process by which retailer becomes an approved SNAP participant).

FNS is authorized to monitor retail food stores' EBT transactions to combat fraud in the administration of the SNAP program. See 7 C.F.R. § 278.6. Specifically, FNS is authorized to electronically monitor and conduct periodic reviews of stores' EBT transactions and investigate a store when it believes an investigation is warranted by suspicious data. Id. FNS may disqualify any authorized retail food store from future participation in SNAP for violating any provision of the Food and Nutrition Act or a regulation promulgated thereunder. 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6. SNAP regulations permit FNS to disqualify a store if it concludes a violation has occurred "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC)." 7 C.F.R. § 278.6(a). The period of disqualification may range from as little as six months to permanent, depending on the nature of the violation. In certain circumstances, FNS also has the discretion to assess a civil monetary penalty ("CMP") in lieu of disqualification. 7 C.F.R. § 278.6(a)(1), (e)(1), (f), (i).

One type of SNAP fraud is trafficking, which generally involves the exchanging of SNAP benefits for cash or a form of consideration other than eligible food items. See 7 C.F.R. § 271.2. Under the relevant SNAP regulations, retail food store owners may not accept EBT benefits as payment for ineligible items—generally non-food items, alcoholic beverages, and some prepared hot food items. Id. (defining "[e]ligible foods" under the SNAP program). Food store owners are also prohibited from exchanging EBT benefits for cash, even if the store discounts the benefits—for example, charging a customer $25 on his or her EBT card in exchange for $20 cash. Id. Even for a first violation, the penalty for trafficking is permanent disqualification. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

Alternatively, FNS may impose a CMP in lieu of permanent disqualification if the store submits substantial evidence that it had established and implemented an effective compliance policy and program to prevent SNAP violations. See 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i). FNS has discretion to impose a CMP in lieu of permanent disqualification if the store provides "substantial evidence" of the following four criteria:

> Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of the violations cited in the charge letter sent to the firm; and
>
> Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and
>
> Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the

4

conduct or approval of trafficking violations; or it was only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm. Upon the second occasion of trafficking involvement by any member of firm management uncovered during a subsequent investigation, a firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. Notwithstanding the above provision, if trafficking violations consisted of the sale of firearms, ammunition, explosives or controlled substances, as defined in 21 U.S.C. § 802, and such trafficking was conducted by the ownership or management of the firm, the firm shall not be eligible for civil money penalty in lieu of permanent disqualification. For purposes of this section, a person is considered to be part of firm management if that individual has substantial supervisory responsibilities with regard to directing the activities and work assignments of store employees. Such supervisory responsibilities shall include the authority to hire employees for the store or to terminate the employment of individuals working for the store.

7 C.F.R. § 278.6(i).

When an investigation results in agency action to disqualify a store or assess a CMP on the owner, federal regulations provide for a system of administrative and judicial review. After receiving written notice of the action, an aggrieved retailer may request review of the administrative action by FNS. 7 U.S.C. § 2023(a); 7 C.F.R. § 279.1; see also 7 C.F.R. § 279.5(c) (defining scope of review for disqualification actions). If a store requests review, the administrative action is held in abeyance pending disposition of the request for review, unless the penalty is a permanent disqualification for trafficking. 7 C.F.R. §§ 279.1, 279.4(a). In cases of a permanent disqualification for trafficking, the disqualification action is effective from the date the firm receives notice of the disqualification. 7 U.S.C. § 2023(a)(18). Upon completion of the review, FNS renders a

"Final Agency Decision" and notifies the retailer. 7 C.F.R. § 279.5(e). This Final Agency Decision becomes effective thirty days from the date of delivery. Id. § 279.5(f).

**B.**     **Factual Background**

**1.**     **Investigation**

The FNS Retailer Operations Division ("ROD") began an investigation into the Store after ROD's EBT ALERT[1] system showed that the Store's EBT data contained patterns consistent with trafficking from April through September 2019. (Administrative Appeal Record ["A.R."] at 272, ECF No. 11).[2] On September 3, 2019, an FNS contractor conducted a store visit (the "Store Visit"), to which Hesham consented. (Id. at 188–92). Hesham assisted in preparing the report memorializing the Store Visit (the "Store Visit Report"). (Id. at 189, 194). The Store Visit Report detailed that the Store had no optical scanners at the checkout, no shopping carts, no evidence of a wholesale business, and used the typical pricing structure of prices ending in $.x9. (Id. at 188). The Store had one shopping basket and the checkout area operated behind a night window/plastic barrier. (Id.). The Store had one checkout area with one cash register and one SNAP EBT terminal.

---

[1] ALERT, which stands for the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions, is the system that FNS uses to analyze daily EBT data for patterns which may reveal fraudulent activity. (Def.'s Mem. Supp. Mot. Dismiss Alt. Summ. J. ["Mot."] at 7 n.3, ECF No. 12-1).

[2] USDA filed the Administrative Appeal Record in two parts: Part 1 contains pages 1 through 150 of the Administrative Record, (ECF No. 11-2), while Part 2 contains pages 151 through 415, (ECF No. 11-3).

The declaration of Shanta Swezy, Chief of the Administrative Review Branch of the Retailer Policy and Management Division of FNS, certifies that the Administrative Appeal Record is a true and correct copy of the record considered by USDA in sustaining the decision to disqualify the Store permanently from SNAP. (ECF No. 11-1).

(Id. 189). Food was stored outside the public view in a storage space measuring approximately 392 square feet and containing staple foods, non-staple foods, and non-food items. (Id. 189, 191). The Store had no storage coolers, freezers, or food stored at other locations, did not primarily sell one type of food, and did not take orders or provide delivery. (Id. at 189). The Store did not round transaction totals up or down at checkout or sell meat bundles, seafood specials, or fruit/vegetable boxes. (Id.). The contractor noted the four most expensive items as: (1) Nestle Coffeemate Creamer ($19.99); (2) Murry's Chicken Wings ($19.99); (3) Similac Advance Infant Formula ($17.94); and (4) Similac Sensitive Infant Formula ($17.49). (Id.). Finally, the contractor noted that the Store did not have a kitchen area for food preparation, sell hot food or food for onsite consumption, have a deli or prepared food section, or use store stock to make prepared items. (Id. at 191). The contractor provided a breakdown of the types and quantities of foods available in the four staple food categories (dairy products; fruit and vegetables; breads and cereals; and meats, poultry, and fish), a rendering of the layout, and photographs of the Store. (Id. at 192–242).

ROD reviewed and analyzed all the information in the Store Visit Report and the information about the Store in the FNS system. (Id. at 271–94). ROD noted the Store was a poorly stocked convenience store of about 616 square feet with inventory consisting of canned goods, bread, cereal, dairy products, some frozen items, baby formula, soda, snacks, and candy. (Id. at 278). ROD noted that the Store did not carry fresh meat, meat plans, fresh produce, deli products, or specialty or ethnic foods. (Id.). It also noted that large transactions would be difficult to make at the Store, given that there was one shopping basket, no shopping carts, no optical scanner or conveyor belt, and the about one-square

foot check-out counter surrounded by plexiglass. (Id.). ROD also noted that the Store did not accept WIC. (Id.).

ROD also analyzed the Store's SNAP EBT data and found suspicious transaction patterns that fell into two categories: (1) repetitive transaction in a set period by the same household/account ("rapid-and-repetitive transactions"); and (2) transactions for an unusually high dollar value ("high-dollar transactions"). (Id. at 280–82). As for the rapid-and-repetitive transactions, ROD noted that stores commonly ring up multiple transactions in a set period to avoid single high-dollar transactions. (Id. at 280). ROD concluded that there was little reason for a household to spend large amounts of money at the Store given the Store's limited inventory. (Id.). ROD noted that the high-dollar transactions were considered unusual based on the observed store characteristics and recorded food stock. (Id. at 281–82).

For purposes of its investigation, ROD identified two comparator stores—Comp Store #1 and Comp Store #2—as two better-stocked convenience stores located 0.3 miles and 0.92 miles away, respectively, from the Store. (Id. at 283; see also id. at 95–113 (store visit report for Comp Store #2); id. at 114–31 (store visit report for Comp Store #1). ROD noted that both stores had inventory that consisted of canned goods, bread, cereal, some fresh produce, deli products, dairy products, baby formula, soda, snacks, and candy, and both stores accepted WIC. (Id. at 283). ROD compared the Store's transactions to those at the comparator stores and found that the Store had more rapid-and-repetitive and high-dollar transactions overall, had far more high-dollar transactions in the breakdowns by

dollar amount, and had higher average transaction amounts, despite having less inventory than the comparator stores. (Id. at 284–86).

ROD also reviewed the shopping patterns of selected households involved in suspicious transactions during the review period and found that those households were also regularly shopping at larger, better-stocked "supermarkets and superstores," but spending substantially more at the Store. (Id. at 287–93). ROD also noted that, although all three of the households analyzed lived closer to a superstore than the Store, they bypassed the superstore to spend more money at the Store. (Id. at 294).

### 2. Charge Letter

Following its review, ROD concluded that the evidence warranted issuing a trafficking charge letter to the Store. (Id.). Denise Thomas, Section Chief for ROD, sent a letter to Plaintiffs dated November 26, 2019 (the "Charge Letter"). (Id. at 295–97). The Charge Letter informed Plaintiffs that an analysis of the EBT transactions for April through September 2019 established clear and repetitive patterns of unusual, irregular, and inexplicable activity for the Store's type. (Id. at 295). It also informed Plaintiffs that the Store was being charged with trafficking, as defined by 7 C.F.R. § 271.2, and was being considered for a permanent disqualification from the program. (Id.). The Charge Letter detailed the suspicious transactions and included a breakdown of the suspicious transactions patterns as an attachment to the Letter. (Id. at 295–301). The Charge Letter explained Plaintiffs' right to reply to the charges and present "any information, explanation, or evidence regarding these charges" either in writing or by phone to Anthony Pesini, an FNS employee, within ten days of the receipt of the Charge Letter. (Id. at 296–

97). The Letter also stated that the Store could request a CMP in lieu of permanent disqualification, but to do so, Plaintiffs must present information, within ten days of the receipt of the Charge Letter, that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i). (Id. at 295–96).

Plaintiffs received the letter on November 27, 2019. (Id. at 302). Plaintiffs, through their accountant, responded by letter dated December 6, 2019 (the "Response Letter"). (Id. at 304). The Response Letter provides, in full:

> This letter is written on behalf of our clients, Brothers Convenience Store, Hesham Ghaleb and Maged A. Ghalib [sic] to advise you that the random computer analysis of the alleged trafficking detected by USDA computer from April 1, 2019 to about April 19, 2019 is untrue.
>
> We have attached the purchases and transactions by the card owners. We also have attached copies of the company's Z1 report of the EBT cards, bank statements, pictures of the store merchandises to advert that Trafficking of any kind is false.
>
> Therefore, we request that you quash the allegations on your letter dated November 26, 2019 after you fairly review the attachments herein.
>
> Thank you for your anticipated cooperation.

(Id.). The Response Letter included photos, (id. at 305–21); register receipts (id. at 322–31); and bank records, (id. at 332–77).

After receiving the Response Letter, ROD compared the information submitted by the Plaintiffs to the information it compiled before sending the Charge Letter. (Id. at 380). ROD noted that the Store was a typically stocked convenience store with inventory consisting mostly of soda and snacks, with some staple foods such as frozen foods, bread,

dairy products, cereal, and baby formula; thus, it was improbable that a household would shop at the Store between three and five times in a one and one-half day span, spending as much as $200. (Id. at 380–81). ROD similarly found that the high-dollar transactions were unlikely to take place given the Store's inventory. (Id. at 381–82). ROD noted that Plaintiffs did not explain the transactions other than to say they were false. (Id. at 382). ROD reviewed the invoices and bank credit card statements and, based on the purchases that could be verified as food items, found that the Store had enough inventory to justify the redemptions based on a forty percent markup and twenty percent cash and credit card sales. (Id. at 382–83). If, however, the cash and credit card sales increased even by five percent, then there was not sufficient inventory. (Id. at 383). ROD also noted that the register receipts provided limited information about the transactions because they were just dollar amounts with no itemization. (Id.). Notably, ROD observed that there was a significant reduction in redemptions and flags for rapid-and-repetitive and high-dollar transactions after the Store received the Charge Letter. (Id. at 384). Plaintiffs did not request or provide any evidence to support eligibility for the CMP in lieu of permanent disqualification. (Id. at 385–86). Based on all this information, ROD determined that it was more likely than not that the suspicious transactions stemmed from trafficking and that permanent disqualification was the appropriate penalty. (Id. at 386).

FNS issued its determination letter on February 25, 2020 (the "Determination Letter"). (Id. at 387–88). The Determination Letter informed Plaintiffs that FNS had concluded that the violations alleged in the Charge Letter were likely true and that it was imposing a permanent disqualification for the trafficking violations. (Id. at 387). The

Determination Letter also stated that the Store was ineligible for a CMP because Plaintiffs failed to submit sufficient evidence to prove that the Store had established and implemented an effective compliance program to prevent violations of SNAP. (Id.). The Store was advised of the right to appeal to the Agency's Administrative Review Branch ("ARB") and notified that such appeal must be filed within ten days of receiving the Determination Letter. (Id.). Plaintiffs were informed that the Store could not accept SNAP benefits until after a decision was rendered. (Id. at 387–38).

## C.   **Procedural History**

### 1.   **Administrative Review**

On March 2, 2020, the Plaintiffs sent a brief letter requesting administrative review. (Id. at 389). The letter "requested that the adverse decision be set aside" and explained that "[t]he parties provided all the documents pertaining to each of the sale[s] and are unable to ascertain how the legitimate transactions are being classified as trafficking." (Id.).

On March 9, 2020, Administrative Review Officer ("ARO") Robert Deegan sent a letter to Plaintiffs to confirm receipt of the Store's request for an administrative review. (Id. at 394). The letter also informed Plaintiffs that if they wished to submit any additional information, it must be postmarked by March 30, 2020. (Id.). Plaintiffs received the letter on March 10, 2020. (Id. at 395). Plaintiffs did not submit any additional information. (Id. at 398).

On May 5, 2020, the ARO issued a Final Agency Decision concluding that the record contained sufficient evidence to support a finding that the permanent disqualification of the Store from participation in SNAP was appropriate. (Id. at 401–14).

12

In the decision, the ARO summarized the contentions submitted by the Store and the case assembled by the Office of Retailer Operations and Compliance ("ROC").[3] (Id. at 401–03). After reviewing the Store's background and Store Visit Report, the ARO observed that the Store had very narrow aisles and marginally stocked shelves, display racks, and coolers, noting that the quantity and variety of the Store's staple food inventory was less than what had been documented in previous store visits. (Id. at 404–05). Noting that the Store carried a limited selection of infant formula, the ARO commented that most SNAP households with infants and small children were also WIC participants and therefore likely to purchase these items at a WIC-authorized firm rather than using SNAP benefits at the Store. (Id. at 405).

The ARO also reviewed the attachments to the Charge Letter, including the list of rapid-and-repetitive transactions. The ARO stated that the rapid-and-repetitive transactions were unusual and often used as a method of avoiding single high-dollar transactions that cannot be supported by the store inventory or structure. (Id. at 406). After noting that the Plaintiffs did not provide any documentation or explanation to support the legitimacy of the transactions, the ARO stated that these transactions were suspicious because they were not consistent with households returning to purchase forgotten items, household members shopping together but making separate purchases, households dividing purchases, or households making separate purchases to check their balances before making other purchases, since all of the transaction sets occurred more than three hours apart, and many

---

[3] During the pendency of the administrative appeal, ROD changed its name to the "Office of Retailer Operations and Compliance," or "ROC." (Mot. at 13 n.5).

of the subsequent purchases were as large if not larger than the initial purchase. (Id.). The ARO also stated that Plaintiffs did not explain why these sizable repeat transactions were occurring at the Store when there were many larger retail food stores nearby—including one superstore and one medium-size grocery store within three and four blocks from the Store, respectively—where suspect households were also shopping. (Id.). The ARO stated that while it was not unusual for some households to conduct multiple transactions in a short period, it was nonetheless unusual for the total dollar amounts for the transaction sets to be so much above the county averages. (Id.). The ARO also found it suspicious that the households were shopping at a variety of nearby comparably sized or larger food stores within twenty-four to seventy-two hours of shopping at the Store yet spending more at the Store than at the larger stores, which were likely to be better shocked. (Id. at 407–08).

As for the high-dollar transactions, the ARO found these transactions to be improbable given the Store's inventory documented in the Store Visit Report and the frequency of the transactions. (Id. at 408). The ARO stated that the substantial number of high-dollar transactions were uncharacteristic for a very small convenience store and were substantially higher than the average SNAP transaction for convenience stores in Baltimore City. (Id. at 408–09). The ARO again noted that the households involved were also shopping at full-line superstores and supermarkets that offered greater quantity and variety of SNAP-eligible food items at better prices than customers could find at the Store. (Id. at 409). The ARO found that the Store's breakdown of transaction patterns was unusual as compared to the Baltimore City convenience store averages, noting that the Store's average SNAP transaction dollar volume and SNAP transaction count were much larger than the

city average, yet its average normal transaction dollar amount was smaller. (Id.). The ARO stated that this combination indicated that the Store may be dividing larger transactions into multiple smaller transactions to circumvent detection. (Id.). The ARO found that none of the nearby stores had similar deviations. (Id.). The ARO also stated that the transactions were not suspicious simply because they exceeded a set dollar amount, but because they were inconsistent for this type of store and the Store's inventory. (Id. at 410).

The ARO also reviewed Plaintiffs' submissions against the high-dollar transactions. The ARO agreed with ROC's analysis of the bank statements, finding that, although there was adequate inventory to support the transactions, that alone was insufficient to explain the suspicious transactions. (Id. at 411). The ARO questioned the store photos Plaintiffs submitted, as they showed significantly greater quantities and varieties of staple and accessory food items than were present during the Store Visit. (Id.). Additionally, the ARO stated that the cash register receipts were insufficient to disprove trafficking because they were not itemized and therefore did not show what the Store actually sold. (Id.). Finally, the ARO discussed the pronounced fluctuation in SNAP redemptions and suspicious transactions following receipt of the Charge Letter, suggesting it was a "clear indication of trafficking since, if trafficking were not occurring, there would be no abnormal fluctuations in redemption amounts." (Id.).

Based on his review of the evidence in the record, the ARO concluded that ROC's decision to disqualify the Store permanently from participation in SNAP should be sustained. (Id. at 413–14). In addition, the ARO affirmed ROC's determination that the Store was ineligible for a CMP in lieu of disqualification because the Store failed to submit

evidence to demonstrate that is had established and implemented an effective compliance policy and program to prevent SNAP violations. (Id. at 413). The Final Agency Decision also explained Plaintiffs' appeal rights. (Id. at 414). Plaintiffs received notice of the Final Agency Decision on May 6, 2020. (Id. at 415).

### 2. Present Case

Plaintiffs filed suit against the USDA on May 29, 2020. (ECF No. 1). Plaintiffs' three-count Complaint seeks judicial review of the Final Agency Decision permanently disqualifying the Store from the SNAP program and denying its eligibility to pay a CMP in lieu of a permanent disqualification (Counts I and II) and asserts that the Final Agency Decision violated due process (Count III). (Compl. ¶¶ 8–43). Plaintiffs request that the Court vacate the Final Agency Decision and permanently enjoin FNS from terminating the Store's ability to participate in SNAP. (Id. at 6).

USDA filed its Motion to Dismiss or, in the Alternative, for Summary Judgment on November 12, 2021. (ECF No. 12). Plaintiffs filed their Opposition on February 22, 2021. (ECF No. 17). On March 1, 2021, USDA filed a Reply. (ECF No. 18).

## II.    DISCUSSION

### A.    Standard of Review

### 1. Judicial Review

After receiving notice of the final action by the Agency, an aggrieved retailer may seek de novo judicial review of the administrative action. 7 U.S.C. § 2023(a)(13), (15); 7 C.F.R. § 279.7. This de novo review requires that "the district court … 'reach its own factual and legal conclusions based on the preponderance of the evidence, and should not

limit its consideration to matters previously appraised in the administrative proceedings.'" Ibrahim v. United States, 834 F.2d 52, 53–54 (2d Cir. 1987) (quoting Modica v. United States, 518 F.2d 374, 376 (5th Cir. 1975)). In this context, de novo review "means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur." AJS Petroleum, Inc. v. United States, No. L-11-1085, 2012 WL 683538, at *4 (D.Md. Mar. 1, 2012) (citations omitted). It "does not, however, entitle plaintiffs to reach a trial on the merits of their cause of action." Bon Supermarket & Deli v. United States, 87 F.Supp.2d 593, 598 (E.D.Va. 2000). Instead, Congress simply "intended . . . [that] the district court would not be bound by the administrative record." Id. (quoting Redmond v. United States, 507 F.2d 1007, 1011 (5th Cir. 1975)).

As for a court's review of an Agency's penalty determination, the United States Court of Appeals for the Fourth Circuit has held that "the scope of judicial review extends to the period of administrative sanction." Cross v. United States, 512 F.2d 1212, 1215 (4th Cir. 1975). Reviewing courts apply the "arbitrary and capricious" standard to determine whether the sanction imposed is valid. See, e.g., Mahmood v. United States, No. WMN-12-228, 2012 WL 3038638, at *2 (D.Md. July 24, 2012).

Importantly, "summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact." Bon Supermarket & Deli, 87 F.Supp.2d at 599; see Idias v. United States, 359 F.3d 695, 696 (4th Cir. 2004) (affirming district court's award of summary judgment in case involving permanent disqualification for food stamp trafficking); see also Freedman v. USDA, 926 F.2d 252, 261 (3d Cir. 1991) (holding that the statutory requirement of a

17

trial de novo "is compatible with a summary judgment disposition if there are no material facts in dispute"). Likewise, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." Duchimaza v. United States, 211 F.Supp.3d 421, 439 (D.Conn. 2016) (citations omitted).

### 2.    Conversion

USDA styles its Motion as a motion to dismiss or, in the alternative, for summary judgment. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly

18

captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, Plaintiffs' counsel has submitted a Rule 56(d) affidavit explaining the need for additional discovery. (See Decl. Jessie Lyons Crawford Supp. Pls.' Req. Disc. ["Rule 56(d) Aff."], ECF No. 17-3). The affidavit indicates that Plaintiffs seek seventeen different categories of discovery materials from USDA, including, among other things: the data, investigative reports, case studies, and other information upon which the Agency relied to issue the Charge Letter and Final Agency Determination; copies of all internal memoranda, training materials, and guidebooks used by FNS employees; and specific personal identifying information of the SNAP beneficiaries involved in the suspicious transactions. (Id. ¶ 4). Additionally, Plaintiffs seek to depose the ARO and other Agency employees. (Id. ¶ 5).

At bottom, the discovery materials Plaintiffs seek would not create a genuine issue of material fact. Plaintiffs bear "the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur." AJS Petroleum, 2012 WL 683538, at *4. Thus, to avoid summary judgment here, Plaintiffs would need to demonstrate a genuine issue of material fact as to circumstances giving rise to the forty-three instances of rapid and repetitive transactions from the same household in a very short period, (A.R. at 298–99), and ninety-seven excessively large purchases over the course of the review period, (id. at 95–100). Plaintiffs' counsel states generally that "Plaintiffs cannot rebut the Defendant's evidence without th[e] information" and that the "information is very important to Plaintiffs[']s defense." (Rule 56(d) Aff. ¶ 4). But Plaintiffs' counsel does not explain how access to the Agency's data, case studies, or internal memoranda could raise a dispute of material fact as to the 140 suspicious transactions at issue, particularly when the

information upon which the Agency relied has already been made part of the administrative record of this case. In other words, "[n]one of [Plaintiffs'] requests deal with [the] burden of disproving the actual occurrence of each of the alleged violations." Tikabo v. United States, No. 4:16-cv-02197, 2017 WL 4112306, at *3 (S.D.Tex. Sept. 18, 2017). As such, they are insufficient to raise a genuine dispute of material fact.

Similarly, while Plaintiffs contend that they are entitled to discover the identities of households whose EBT data was contained in the administrative record, Plaintiffs once again fail to articulate how these identities will create any dispute of material fact as to each of the numerous suspicious transfers that FNS identified. See Negash v. United States, No. RDB-17-1954, 2018 WL 3428716, at *4 (D.Md. July 16, 2018) ("Negash II") (rejecting a store's contention that it was entitled to identities of EBT households where plaintiff "fail[ed] to articulate how these identities will create any dispute of material fact as to each of the hundreds of suspicious transfers that FNS identified"), aff'd, 772 F.App'x 34 (4th Cir. 2019).

In sum, because Plaintiffs fail to explain how the requested discovery would raise a dispute of material fact as to the suspicious transactions at issue, Plaintiffs have not established the need for discovery under Rule 56(d). Of course, denying a plaintiff's request for discovery is appropriate where "the administrative record and other evidence appended to the parties' briefs provide a sufficient factual foundation" for summary judgment and "additional discovery would not change the factual landscape in [the] case." AJS Petroleum, 2012 WL 683538, at *5. For these reasons, the Court will treat USDA's Motion as one for summary judgment.

21

### 3.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

**B.   <u>Analysis</u>**

**1.   Review of Final Agency Decision (Counts I and II)**

Plaintiffs seek the Court's review of two distinct parts of the USDA's Final Agency Decision: (1) the determination that the Store engaged in trafficking (Count I); and (2) the decision to permanently disqualify the Store from participation in the SNAP program (Count II). Because these determinations are subject to different standards of review, the Court will address them in turn.

**a.   Finding of Trafficking**

Plaintiffs first seek review of the Agency's determination that the Store engaged in trafficking of SNAP benefits. As noted above, the Agency's determination that the Store engaged in trafficking must be reviewed <u>de novo</u>, meaning that the Court must "reach its

own factual and legal conclusions based on the preponderance of the evidence." Ibrahim, 834 F.2d at 53–54 (citation omitted). In this context, de novo review "means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur." AJS Petroleum, 2012 WL 683538, at *4. To satisfy this burden, the retailer may introduce evidence from outside the administrative record. See id.

As a preliminary matter, the Court notes that a store can be held liable for trafficking even without direct evidence—i.e., even if the store was not caught exchanging EBT benefits for cash "red handed." See id. at *5 (quoting Young Choi Inc. v. United States, 639 F.Supp.2d 1169, 1178 (D.Haw. 2009)); see also Savera Super Store, LLC v. United States, No. 1:14-cv-00554, 2016 WL 55274, at *1 (D.N.H. Jan. 5, 2016) ("[S]ummary judgment may be appropriate based on that record evidence even in the absence of 'red handed' evidence of trafficking."); Nadia Int'l Mkt. v. United States, No. 5:14-cv-82, 2015 WL 7854290, at *5 (D.Vt. Dec. 2, 2015) ("The Agency . . . need not catch a store 'redhanded' to support its determination of trafficking."). Instead, the Agency's decision to permanently suspend a food store from SNAP may be based upon "facts established through on-site investigations, inconsistent redemption data, [and] evidence established through a transaction report under an electronic benefit transfer system." See 7 U.S.C. § 2021(a)(2); see also 7 C.F.R. § 278.6(a). As such, courts have routinely granted summary judgment in favor of the Agency where it relied on, among other things, EBT data showing that the stores had suspicious transactions.[4]

---

[4] See, e.g., Duchimaza, 211 F.Supp.3d at 434 (granting summary judgment in agency's favor where EBT data showed "EBT transactions where multiple withdrawals

With this in mind, the Court turns to the evidence here. ROD's investigation, which spanned from April through September 2019, uncovered forty-three separate instances of rapid-and-repetitive transactions from fifteen sets of transactions from the same household in a very short period. (A.R. at 298–99). These types of transactions "are a common tactic by stores trafficking in food stamps to hide their tracks." Capellan v. United States, No. 1:17-cv-09342, 2020 WL 1047907, at *5 (S.D.N.Y. Mar. 4, 2020). Within these sets of transactions, the period from the initial to the later purchase ranged from less than three hours to about thirty-four hours, with the aggregate purchases ranging from $75.11 to $204.25. (A.R. at 298–99). Notably, ROD determined that the Store had fifteen sets of same-household rapid-and-repetitive transactions for a total of forty-three transactions, while the better-stocked comparator stores both had zero. (A.R. at 284). "The significant variance between the average amounts of Plaintiff's suspicious EBT transactions and the

---

were made from the account of a single SNAP household within 24 hours"); Young Choi, 639 F.Supp.2d at 1178 (granting summary judgment in agency's favor where EBT data revealed "rapid and multiple transactions"); S. Hill Mkt. v. United States, No. 2:19-cv-00073, 2020 WL 4043819, at *3-4 (E.D. Wash. July 17, 2020) (granting summary judgment in the Government's favor where "FNS's disqualification decision was the number of high-value SNAP transactions at the Market compared to retailers of similar size and capacity in the same area" and where plaintiff's explanations were "generalized explanation[s] for large expenditures lacking any specific evidence in the record"); Negash I, 2018 WL 722481, at *2–3 (granting summary judgment in agency's favor where EBT data revealed "rapid and repetitive transactions in a short period from the same household"); Shanaa v. United States, No. 15-CV-42, 2017 WL 2838150, at *4 (E.D.Wis. June 30, 2017) (granting summary judgment in the Government's favor where EBT found "excessive numbers of large dollar purchases," which were "inconsistent with the store's inventory which is predominately comprised of low value food items" (internal quotation marks omitted)); Hanna v. United States, No. 2:04-cv-74627, 2007 WL 1016988, at *2 (E.D.Mich. Mar. 30, 2007) (granting summary judgment agency's favor where EBT data revealed "a number of instances of a single food stamp recipient engaging in multiple transactions within a relatively short time period").

average amounts of comparable small grocery stores' EBT transactions is strong evidence that Plaintiff trafficked in SNAP benefits." Almonte Mkt. v. United States, No. 3:18-cv-30035, 2020 WL 93994, at *7 (D.Mass. Jan. 8, 2020) (citations omitted). Thus, the evidence of dozens of rapid-and-repetitive transactions from the same household over a very short period strongly supports a finding that the Store engaged in trafficking.

As for evidence of high-dollar transactions, ROD's investigation discovered ninety-seven transactions at the Store involving an excessively large purchase. (A.R. at 95–100). As with the rapid-and-repetitive transactions, the frequency of high-dollar transactions at the Store was high compared to other stores in the area—specifically, while the Store had ninety-seven high-dollar transactions, Comp Stores #1 and #2 had fourteen and thirty-four, respectively, and the Store had significantly more high-dollar transactions in every price range compared to the comparator stores. (A.R. at 284–85). "An unusual number of high-dollar transactions is . . . an indicator of trafficking based on Government analysis of stores caught in trafficking violations during on-site investigations." Duchimaza, 211 F.Supp.3d at 437. Accordingly, the evidence of an unusually high number of high-dollar transactions occurring at the Store strongly supports a finding that such purchases were not legitimate transactions.

Finally, the precipitous decline in suspicious EBT trends after Plaintiffs received the Charge Letter also serves as evidence of trafficking. FNS analyzed the Store's EBT data for the six-month period from April through September 2019 and sent the Charge Letter to the Plaintiffs on November 27, 2019. (A.R. at 295–97). Notably, the number of repetitive transactions in a set period by the same household or account dropped to zero in

December 2019. (Id. at 384). In addition, the number of excessively large transactions went from an average of 16.17 per month during the period from April to September 2019 to only nine in December 2019, representing a 45% decline. (Id.). Plaintiffs' failure to explain why "the number of suspicious transactions diminished sharply and precipitously once [they] learned [that] FNS suspected [the Store] of trafficking" allows the court to "draw[] the only logical conclusion possible based on this evidence: . . . the Store w[as] trafficking in EBT benefits." See Negash v. United States, No. RDB-17-1954, 2018 WL 722481, at *4 (D.Md. Feb. 5, 2018) ("Negash I"), aff'd, 772 F.App'x 34 (4th Cir. 2019); see also Dollar Plus Food Mart LLC v. United States, No. 2:13-cv-00193, 2015 WL 11090898, at *6 (D.Ariz. May 8, 2015) (granting summary judgment for the United States where plaintiff "has not explained," among other things, "why SNAP transactions decreased dramatically after [the store] received the Charge Letter").

Taken together, the unusually high number of suspicious transactions at the Store, along with Plaintiffs' failure to explain the sudden decline in suspicious transactions after receipt of the Charge Letter, strongly support a finding that the Store was engaged in trafficking of SNAP benefits. By contrast, the evidence in support of Plaintiffs' position is limited. As the Agency points out, prior to filing this lawsuit, Plaintiffs had two opportunities to respond to the allegations that the Store had trafficked in SNAP benefits— first, in response to the Charge Letter; and second, in seeking review with the FNS Administrative Review Branch. Despite this, Plaintiffs have done little to satisfy their burden of establishing that the suspicious transactions were legitimate. First, at no point have Plaintiffs alleged that the suspicious transactions outlined in the Charge Letter did not

occur. See Badruddin v. United States, No. 1:17-cv-05542, 2019 WL 3855322, at *4 (N.D.Ga. July 15, 2019) (granting summary judgment where FNS identified certain transactions evidencing trafficking and "Plaintiffs did not, and do not, dispute that these transactions occurred"). Second, in response to the Agency's initial Charge Letter, Plaintiffs stated they were "unable to ascertain how the legitimate transactions are being classified as trafficking" and "that Trafficking of any kind is false." (A.R. at 304, 389). Of course, a "general denial of the trafficking charge . . . [is] easily dismissed as conclusory." Almonte Mkt., 2020 WL 93994, at *6–7.

Aside from their bare-bones denial, the only evidence Plaintiffs produced at the administrative level was: (1) store photos, which demonstrated that the Store's inventory was nothing other than that of a typically stocked convenience store, (A.R. at 305–21); (2) invoices and bank records, which demonstrated that the Store may have had sufficient inventory to support the sales, (id. at 332–77, 382–83); and (3) register receipts, which lacked sufficient information about the transactions because they were only dollar amounts without itemization, (id. at 322–31). Critically, this documentation does not adequately explain how or why customers were often making rapid-and-repetitive and high-dollar transactions at the poorly stocked Store. See Capellan, 2020 WL 1047907, at *5 (granting summary judgment to the Government where "Plaintiffs have not put forward any explanation as to . . . the rapid-fire transactions"). Accordingly, the documentation Plaintiffs introduced at the administrative level is insufficient to overcome the strong record evidence in support of trafficking.

28

For their part, Plaintiffs have introduced new evidence as part of their Opposition to USDA's dispositive motion. First, Plaintiffs submit eighteen declarations from Store customers. (See Customer Affs., ECF No. 17-4). In the declarations, the customers aver that they make "frequent purchases" from the Store, some of which happen within two, three, four, seven, and eight days of one other. (Id. at 2–5, 7, 12–15, 17–18). The Court presumes that Plaintiffs introduce this information to show that the conduct FNS labeled as suspicious comports with certain customers' routine buying habits. Importantly, however, each of the rapid-and-repetitive transactions FNS identified occurred within thirty-four hours of one other, not two or more days apart. (A.R. at 298–99). Thus, the consumer declarations do not provide an adequate explanation for these transactions.

Plaintiffs also submit affidavits in which the Ghalebs generally deny that the Store has engaged in trafficking in SNAP benefits. (See ECF Nos. 17-5, 17-6). Courts have consistently held that affidavits containing mere "conclusory denials of trafficking, unsupported by any demonstrative evidence, cannot withstand summary judgment." J & L Liquor, Inc. v. United States, No. 16-10717, 2017 WL 4310109, at *7 (E.D.Mich. Sept. 28, 2017) (footnote omitted); see also Nasunin v. U.S. Dep't of Agric., Food & Nutrition Serv., No. 3:10-cv-00277-SLG, 2013 WL 1687730, at *8 (D.Alaska Apr. 17, 2013) (holding that an affidavit submitted by a store owner, which "lack[ed] supporting documentation or detailed information regarding the suspicious transactions at issue . . . does not create a genuine issue of material fact sufficient to withstand summary judgment"); McClain's Mkt. v. United States, 411 F.Supp.2d 772, 777 (N.D.Ohio 2005) (holding that a store owner's affidavit was insufficient to defeat summary judgment because it "present[ed] no

explanation of any of the 149 transactions asserted against plaintiff, but merely present[ed] general justifications for large expenditures"). Because the affidavits provide no evidentiary support regarding the 140 transactions that FNS identified as suspicious, they are insufficient to create a genuine dispute of material fact.

Finally, Plaintiffs' argument that the underlying investigation was insufficient falls short. Plaintiffs complain that USDA "did not conduct even a basic investigation" because it failed to "contact[ ] cardholders of the alleged suspicious transactions." (Pls.' Opp'n Def.'s Mot. ["Opp'n"] at 14, ECF No. 17-1). As discussed above, however, it was perfectly acceptable for the Agency to base its decision on evidence from on-site investigations and EBT transaction data—indeed, nothing in the Food and Nutrition Act or its corresponding regulations requires FNS to interview EBT beneficiaries to issue a finding of trafficking. Further, because Plaintiffs have the burden at this stage to demonstrate that the alleged violations did not occur, it is insufficient for Plaintiffs to simply challenge the sufficiency of the Agency's investigation.

In sum, considering the administrative record and the evidence presented here, Plaintiffs have not met their burden of showing, by a preponderance of the evidence, that the alleged violations did not occur. Accordingly, the Court upholds the Agency's determination that the Store engaged in trafficking in SNAP benefits. As such, judgment will be entered in favor of the USDA as to Count I.

### b.   Permanent Disqualification

Having found that the Agency's determination that the Store engaged in trafficking of SNAP benefits was well-supported by the record evidence, the Court must next evaluate

the Agency's decision to permanently disqualify the Store instead of allowing it to pay a CMP. The United States Court of Appeals for the Fourth Circuit has held that "the scope of judicial review extends to the period of administrative sanction." Cross, 512 F.2d at 1215. In such cases, reviewing courts apply the "arbitrary and capricious" standard to determine whether the sanction imposed is valid. See, e.g., Mahmood, 2012 WL 3038638, at *2. Importantly, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." Duchimaza, 211 F.Supp.3d at 439.

Where trafficking has been proven, permanent disqualification is the sanction Congress prescribed. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); Idias, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified."). Thus, in the context of SNAP fraud, "permanent disqualification of [a store] from participation in the SNAP program is not arbitrary or capricious and is, in fact, mandated by the statute." Mahmood, 2012 WL 3038638, at *3 (footnote and citation omitted).

Moreover, the only situation in which FNS may impose a CMP in lieu of permanent disqualification is where the store establishes its non-involvement in trafficking and submits substantial evidence showing that it had established and implemented an effective compliance policy. See 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i). Here, the Charge Letter stated that the Store could request a CMP in lieu of permanent disqualification by presenting information that the Store met the criteria established in SNAP regulations. (A.R. at 295–96). Although Plaintiffs submitted a timely response to the Charge Letter

31

generally denying the allegations, the one-page letter did not provide any argument that the Store had implemented an effective compliance policy, request that FNS consider a CMP in lieu of permanent disqualification, or address any of the criteria FNS must evaluate to determine whether to impose a CMP. Because Plaintiffs did not request consideration for a CMP and provided no evidence, information, or argument in support thereof, the Court finds the Agency's decision to disqualify the Store permanently instead of imposing a CMP was not arbitrary and capricious. Thus, USDA is entitled to summary judgment on Count II of the Complaint.

### 2.   Due Process (Count III)

Finally, Plaintiffs assert that the Final Agency Decision violated their substantive and procedural due process rights due to "[t]he Inspector's failure to inform the Plaintiffs that they were under investigation." (Compl. ¶ 40). These claims fail. Courts have consistently held the SNAP disqualification scheme to be constitutional on substantive due process grounds. See, e.g., Negash II, 2018 WL 3428716, at *5 (recognizing that "the Fourth Circuit has held that the SNAP-disqualification scheme is constitutional on substantive due-process grounds" (citations omitted)). Likewise, "courts have rejected procedural due process challenges to the SNAP disqualification scheme." Hanif v. United States, No. 4:15-cv-02718, 2017 WL 447465, at *7 (S.D.Tex. Feb. 2, 2017) (citation omitted); see also SS Grocery, Inc. v. USDA, 340 F.Supp.3d 172, 186 (E.D.N.Y. 2018) (denying plaintiffs' procedural due process claims because "[t]he trial de novo provision clearly afford[s] full procedural due process" (quoting Ibrahim, 834 F.2d at 54)). As such,

Plaintiffs' due process claim fails, and USDA is entitled to judgment in its favor as to Count III of the Complaint.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant USDA's Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 12), which it construes as a motion for summary judgment. A separate Order follows.

Entered this 1st day of September, 2021.

_____/s/_____
George L. Russell, III
United States District Judge